# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CENTRAL DIVISION

| | |
|---|---|
| SCOTT D. PLUM, | |
| Plaintiff, | No. 16-CV-3012-LTS |
| vs. | |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | REPORT AND RECOMMENDATION |
| Defendant. | |

The claimant, Scott D. Plum (claimant), seeks judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying his application for disability insurance benefits (DIB) and Supplemental Security Income (SSI), under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401 *et seq.* (Act). Claimant contends that the Administrative Law Judge (ALJ) erred in determining he was not disabled.

For the reasons that follow, I recommend the District Court affirm the Commissioner's decision.

## I.  BACKGROUND

Claimant was born in March 1972, was 36 years old at the time of the alleged onset of his disability, and was 42 years old at the time of the ALJ's decision. (AR 23, 89, 244).[1] Claimant completed high school and has past relevant work experience as an automobile painter and mechanic. (AR 307-08). Claimant was in a motorcycle accident

---

[1] "AR" refers to the administrative record below.

in 1995, during which he suffered a fractured skull.  (AR 15, 17, 533, 814).  Claimant continued to work full time, however, until November 30, 2008.

On March 5, 2010, claimant filed an application for disability benefits, alleging disability beginning on November 30, 2008, due to seizures and memory loss.  (AR 24, 244, 246, 306).  The Commissioner denied claimant's application and in 2012, an ALJ rendered an unfavorable decision for claimant.  In 2013, the Appeals Council remanded the case for further consideration.  (AR 134).  On May 5, 2014, an ALJ held a hearing at which claimant and a vocational expert testified.  (AR 23-24, 33).  On July 22, 2014, the ALJ again found claimant was not disabled.  The Appeals Council denied claimant's request for review.  (AR 1).  The ALJ's decision, thus, became the final decision of the Commissioner.  *Sims v. Apfel*, 530 U.S. 103, 107 (2000).

On February 17, 2016, claimant filed a complaint in this Court.  (Doc. 3).  The parties have briefed the issues, and on September 8, 2016, the Honorable Leonard T. Strand referred this case to me for a Report and Recommendation.  For the reasons that follow, I respectfully recommend the Court affirm the Commissioner's decision.

## II.    DISABILITY DETERMINATIONS AND THE BURDEN OF PROOF

A disability is defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  An individual has a disability when, due to his/her physical or mental impairments, he/she "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).  If the claimant is able to do work which exists in

the national economy but is unemployed because of inability to get work, lack of opportunities in the local area, economic conditions, employer hiring practices, or other factors, the ALJ will still find the claimant not disabled.

To determine whether a claimant has a disability within the meaning of the Act, the Commissioner follows the five-step sequential evaluation process outlined in the regulations. *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. "Substantial" work activity involves significant mental or physical activities. "Gainful" activity is work done for pay or profit, even if the claimant does not ultimately receive pay or profit.

Second, if the claimant is not engaged in substantial gainful activity, then the Commissioner looks to the severity of the claimant's physical and medical impairments. If the impairments are not severe, then the claimant is not disabled. An impairment is not severe if it does not significantly limit a claimant's physical or mental ability to perform basic work activities." *Kirby*, 500 F.3d at 707.

The ability to do basic work activities means having the ability and aptitude necessary to perform most jobs. These abilities and aptitudes include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987).

Third, if the claimant has a severe impairment, then the Commissioner will determine the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is

considered disabled regardless of age, education, and work experience. *Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity (RFC) and the demands of his/her past relevant work. If the claimant can still perform past relevant work, then the claimant is considered not disabled. Past relevant work is any work the claimant has done within the past 15 years of his/her application that was substantial gainful activity and lasted long enough for the claimant to learn how to do it. A claimant's "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks and citations omitted). The RFC is based on all relevant medical and other evidence. The claimant is responsible for providing the evidence the Commissioner will use to determine the RFC. If a claimant retains enough RFC to perform past relevant work, then the claimant is not disabled.

Fifth, if the claimant's RFC, as determined in Step Four, will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to show there is other work the claimant can do, given the claimant's RFC, age, education, and work experience. *See Bladow v. Apfel*, 205 F.3d 356, 358 n.5 (8th Cir. 2000). The Commissioner must show not only that the claimant's RFC will allow him or her to make the adjustment to other work, but also that other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). If the claimant can make the adjustment, then the Commissioner will find the claimant is not disabled. At Step Five, the Commissioner has the responsibility of developing the claimant's complete medical history before making a determination about the existence

4

of a disability. The burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

If after these five steps, the ALJ has determined the claimant is disabled, but there is medical evidence of substance use disorders, the ALJ must decide if that substance use was a contributing factor material to the determination of disability. 42 U.S.C. § 423(d)(2)(C). The ALJ must then evaluate the extent of the claimant's limitations without the substance use. *Id*. If the limitations would not be disabling, then the disorder is a contributing factor material to determining disability, and the claimant is not disabled.

### III. THE ALJ'S FINDINGS

The ALJ engaged in the five-step sequential analysis outlined above, as reflected in his written decision.

At Step One, the ALJ found claimant had not been engaged in substantial gainful activity since November 30, 2008. The ALJ noted that claimant worked briefly at a Chevrolet dealership changing oil in 2010, but it did not rise to the level of substantial gainful activity. (AR 15).

At Step Two, the ALJ determined claimant had the following severe impairments: "mood disorder, seizure disorder, and residuals of a skull fracture." *Id*.

At Step Three, the ALJ concluded that claimant did not have an impairment or combination of impairments that met or medically equaled in severity one of the listed impairments. *Id*.

At Step Four, the ALJ determined claimant's RFC. The ALJ found that "claimant has the residual functional capacity to perform a full range of work at all exertional levels" but with certain nonexertional restrictions:

> He is able to work where he is not exposed to hazards such as unprotected heights or near unguarded moving machinery. He is able to perform work

5

> tasks that do not involve operation of motor vehicles. He is able to perform work tasks that are simple, routine, and repetitive and which do not require any close attention to detail or any independent judgment on the job. In addition, he requires an occupation where all of the tasks assigned to him can be performed without interaction with the public. He could, however, be in proximity to a member of the public, but none of the jobs [sic] tasks can require him to interact, share information, or gather information from the public. Moreover, he requires an occupation that is performed independently, and not be required to coordinate his efforts with others, or organize his efforts with others to achieve a task.

(AR 16-17).

Based on this RFC assessment, at Step Five, the ALJ determined that, although claimant could not perform any past relevant work (AR 22), there were jobs in significant numbers in the local and national economy that the claimant could perform, including hang packager, janitor, and laundry sorter (AR 23-24). The ALJ concluded, therefore, that claimant was not disabled. (AR 24).

## IV. THE SUBSTANTIAL EVIDENCE STANDARD

A court must affirm the Commissioner's decision "'if the ALJ's decision is supported by substantial evidence in the record as a whole." *Wright v. Colvin*, 789 F.3d 847, 852 (8th Cir. 2015) (quoting *Juszczyk v. Astrue*, 542 F.3d 626, 631 (8th Cir. 2008)); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). "Substantial evidence" is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Wright*, 542 F.3d at 852 (quoting *Juszczyk*, 542 F.3d at 631). The Eighth Circuit Court of Appeals has explained the standard as "something less than the weight of the evidence and allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the

[Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (internal quotation omitted).

In determining whether the Commissioner's decision meets this standard, the court considers "all of the evidence that was before the ALJ, but we do not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (internal citation omitted). The court considers both evidence which supports the Commissioner's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Sec'y of Health & Human Servs.*, 879 F.2d 441, 444 (8th Cir. 1989). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record de novo." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (quoting *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the [Commissioner's] denial of benefits." *Kluesner*, 607 F.3d at 536 (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson*, 30 F.3d at 939 (quoting *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)). The court may not reverse the Commissioner's decision "simply because some evidence may support the opposite conclusion." *Perkins v. Astrue*, 648

F.3d 892, 897 (8th Cir. 2011) (internal quotation marks and citation omitted). *See also Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005) ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion." (internal citation omitted)).

## V. DISCUSSION

Claimant argues the ALJ erred in two ways:

1. The ALJ's residual functional capacity assessment is flawed because it "failed to evaluate properly the work-related limitations from [claimant's] treatment team." (Doc. 13, at 3-11).

2. The ALJ's residual functional capacity assessment is flawed because "it is not supported by substantial medical evidence from a treating or examining source." (Doc. 13, at 11-13).

These issues are interrelated, and are also tied to the ALJ's decision to discount claimant's credibility because it influenced the ALJ's weighing of medical opinions that were based in part on claimant's reports. Further, the ALJ's evaluation of the medical opinions informs whether medical evidence supported the ALJ's determination on residual functional capacity. Therefore, I will address each of these issues below, starting with credibility, then turning to the ALJ's evaluation of the medical evidence, before concluding with the ALJ's determination of claimant's residual functional capacity.

### A. *Claimant's Credibility*

The ALJ found claimant was not a credible source regarding the intensity, persistence, and functionally limiting effects of his impairments. (AR 20-21). In assessing claimant's credibility, the ALJ referenced and considered the factors set out in *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). (AR 17, 21-22). The ALJ

8

considered the following factors: (1) claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints. (AR 21) (citing SSR 96-7p[2], 1996 WL 374186 (July 2, 1996)).

The ALJ examined claimant's daily activities and found them inconsistent with claimant's description of the severity of his alleged seizures and memory problems. (AR 19, 21). The ALJ found claimant was "capable of self-care, preparing simple foods, cleaning, laundry, and household repairs." (AR 22). Claimant walked, biked, fished, watched television, played computer games, fed the dog, ironed clothes, shopped, went to car shows, helped friends with car repairs, used the library, mowed the yard, and went to friends' homes, sports events, and sports bars to hang out. (AR 16, 22, 334-38, 878-81). Claimant also maintained the unusual hobby of collecting thousands of four-leaf clovers and laminating them, on which he testified he spent an "inordinate" amount of time. (AR 22, 77, 319, 881). It was reasonable for the ALJ to conclude that these activities took a degree of concentration and memory that was inconsistent with claimant's statement that he was unable to remember what he did the day before the hearing. (AR 22, 44).

The ALJ also found claimant's poor compliance with medications and treatment damaged his credibility. (AR 18, 22, 503, 530, 727, 730-32, 738). Claimant's poor compliance was not the result of poverty as he was receiving his medications for free. (AR 55). *See Whitman v. Colvin*, 762 F.3d 701, 706 (8th Cir. 2014) (noting that noncompliance medical treatment undercuts credibility). There was also a significant gap

---

[2] The Court notes that SSR 16-3p superseded SSR 96-7p on March 28, 2016. At the time of the ALJ's decision, however, SSR 96-7p was in effect.

9

in claimant's treatment because he failed to keep appointments in early 2012. (AR 727, 730-32).

The ALJ also concluded that the record showed claimant to be manipulative, often seeking some secondary gain. (AR 19-22). Claimant threatened to kill himself to get into or out of facilities and exaggerated his symptoms and got angry when things did not go his way. (AR 479-81). In January 2010, claimant endorsed serious depression, but a therapist observed that claimant's affect and mood were "incongruent" with his alleged depression. (AR 540-42). Similarly, in 2011, claimant was hospitalized briefly for suicidal ideation but improved rapidly and specifically requested assistance obtaining disability benefits. (AR 814, 823, 850). The ALJ properly considered this behavior and motivation in assessing claimant's credibility. *See*, *e.g.*, *Jones v. Astrue*, 619 F.3d 963, 973 (8th Cir. 2010) (holding that ALJ could take into account a claimant's exaggeration of symptoms in assessing credibility); *Eichelberger*, 390 F.3d at 589 (holding that an ALJ may consider motivation for secondary gain in assessing credibility).

The ALJ also considered claimant's work history. The ALJ noted that claimant's prior employer indicated that claimant could understand and execute simple directions in a reasonable amount of time. (AR 18, 343). Claimant was let go from that job in 2008 not because he was unable to perform the job, but because the employer did not have enough work for claimant to do. (AR 344).[3] The ALJ considered this as showing claimant had some capacity for work. Claimant also worked changing oil as late as 2010. (AR 79, 294-95). The ALJ noted that claimant was performing some moving work for claimant's self-described "friend/medical advocate," Rosemary Weidler's parents in 2012 and wanted to be paid for his work. (AR 21-22, 319). The ALJ also considered

---

[3] Claimant had testified that he was fired from the job because of comments he made to a co-worker. (AR 52-54).

as significant claimant's testimony during the hearing that he believed he could work changing oil so long as he did not need to operate a hoist. (AR 21). Combined with Ms. Weidler's indication in a function report that claimant spent time helping friends repair cars (AR 319), the ALJ found this work history inconsistent with the severity of claimant's alleged seizure and memory problems. *Id*.

The ALJ took into account the absence of medical evidence to support claimant's allegations regarding the frequency and duration of his seizures. As is further described below, the ALJ took into account the lack of medical personnel observations of, or medical testing reflecting, claimant's alleged seizures. (AR 17-20). The ALJ also noted claimant exaggerated the severity of his symptoms. The ALJ referenced one incident by way of example when at a medical appointment in November 2011, claimant allegedly could not even speak to answer yes or no questions, and Ms. Weidler had to do all the talking. (AR 22, 717). The ALJ concluded there was "no hint in the record" that would support "[t]hat extraordinary behavior." *Id*.

In short, I find there was substantial evidence on the record as a whole to support the ALJ's decision to discount the weight given to claimant's description of the intensity, persistence, and functionally limiting effects of his impairments. The ALJ's finding that claimant lacked credibility in reporting his own symptoms and impairments affected the ALJ's decision regarding the weight to be given to the medical opinions.

### *B. ALJ's Evaluation of the Medical Opinions*

Claimant argues the ALJ erred at Step Four of the analysis when he allegedly did not properly consider work-related limitations reflected in medical opinions. (Doc. 13, at 3-11). As an initial matter, claimant argues that he had a "treatment team" consisting of psychiatrist Dr. Raja Akbar, M.D. and Mr. Scott Dickinson, LMHC (licensed mental

health counselor). Claimant argues that because Dr. Akbar and therapist Dickinson are part of a "treatment team," the opinions of Mr. Dickinson is entitled to the same status as a treating source because Dr. Akbar is himself an "acceptable medical source." *Lacroix v. Barnhart*, 465 F.3d 881, 886 (8th Cir. 2006).

It is true that Dr. Akbar, as a psychiatrist who saw claimant on a number of occasions between 2011 and 2014 (AR 717, 894-900, 907-08), is "an acceptable medical source" (20 C.F.R. § 404.1513(a)). The record does not, however, support the finding that Dr. Akbar worked as a team with Mr. Dickinson such that Mr. Dickinson's opinion must be elevated to that of an acceptable medical source. The medical records simply do not reflect that Dr. Akbar and Mr. Dickinson coordinated treatment of claimant, although they worked in the same facility. Mr. Dickinson's notes did not refer to Dr. Akbar's participation in treatment other than to note Dr. Akbar's diagnosis. (AR 888). *See Lacroix*, 465 F.3d at 886 (considering fact that notes of nurse practitioner and therapists did not reference a doctor's participation in the case as indicating the absence of a treatment team). Dr. Akbar did review and signed single report issued by Mr. Dickinson. (AR 753). Dr. Akbar did not, however, reference Mr. Dickinson other than simply noting that claimant did not appear to benefit from Mr. Dickinson's treatment. (AR 898-900, 907). Therefore, I do not find sufficient indication that Dr. Akbar and Mr. Dickinson were working as a treatment team to elevate Mr. Dickinson's opinions to those of an acceptable medical source. Regardless, the ALJ considered the opinions of Mr. Dickinson along with those of all the other medical providers.

The ALJ weighed the opinions of various medical providers, affording some more weight than others. The ALJ afforded Dr. Akbar's opinions "some weight," although he noted that "the value of Dr. Akbar's opinions is [sic] diminished when they are compared with his observations and treatment notes." (AR 20). The ALJ gave partial weight to Dr. Akbar's April 2014 statement regarding claimant's mental problems and

included some of those limitations in claimant's residual functional capacity assessment. (AR 20, 907-14). But the ALJ concluded in other respects that Dr. Akbar's clinical observations were "completely at odds with the extreme limits he identified in" his opinion. (AR 20). For example, on the same day Dr. Akbar "reviewed" Mr. Dickinson's opinion that claimant had extremely limited memory, Dr. Akbar's own records showed that claimant's memory was "intact." (AR 900). An ALJ may discount the weight given to opinions of treating doctors when, as here, the opinions are inconsistent with other medical records. *See Myers v. Colvin*, 721 F.3d 521, 525 (8th Cir. 2013) ("We conclude that substantial evidence supports the ALJ's determination that [the doctor's] opinion was inconsistent with the treatment record and thus not entitled to controlling weight.").

The ALJ afforded little weight to the opinions of Mr. Dickinson, finding "the medical evidence of record simply does not support" the limitations Mr. Dickinson endorsed. (AR 19). The ALJ also found there was "nothing in the treatment notes from Mr. Dickenson[4] that would provide a factual basis for his conclusion about work absences." *Id*. The ALJ also found that claimant's daily activities and work history were inconsistent with the limitations that Mr. Dickinson endorsed. *Id*.

The ALJ similarly afforded little weight to the opinions of Dr. J. Michael Seeley. (AR 18). The ALJ noted that Dr. Seeley relied heavily on subjective assertions by claimant and Ms. Weidler, and not on his own observations or objective medical evidence. (AR 18, 611).

The ALJ afforded little weight to the opinions of consultative psychologist Ralph Scott, Ph.D. (AR 19). The ALJ discounted the weight to afford the opinions because it

---

[4] The ALJ, and in turn the Commissioner in her brief, misspelled Mr. Dickinson's name.

13

relied on claimant's subjective allegations. (AR 19, 651-55). The ALJ further noted that Dr. Scott's own notes reflected that much of the history reported "has not been verified and is based on client reports." (AR 19, 655). The ALJ did give some credit to Dr. Scott's testing, however, which "show[ed] problems with memory," but noted that claimant's memory "remains at a functional level, especially for rote learning and visual learning." (AR 653-54, 659).

Finally, the ALJ gave weight to the opinion of state agency medical consultant, Beverly Westra, Ph.D., who found claimant was not disabled, because her opinions were consistent with the other medical evidence, including that from the UIHC.[5] (AR 20, 656-59). State agency psychological consultants, like Dr. Westra, are highly qualified experts in the evaluation of the medical issues in disability cases. SSR 96-6p, 1996 WL 374180 (July 2, 1996), at *1. Accordingly, the ALJ acted well within his discretion in affording Dr. Westra's opinion where, as here, that opinion was supported by other medical evidence.

The ALJ appropriately discounted the medical opinions of Doctors Akbar, Seeley, and Ralph Scott, and Mr. Dickinson because each one accepted as true claimant's assertions that he suffered between three and ten seizures a day. None of these sources, however, saw claimant suffer a seizure. As the ALJ noted (AR 18), the only people to have allegedly seen claimant suffer seizures were claimant and Ms. Weidler. (AR 320). Claimant's and Ms. Weidler's accounts of the number of claimant's seizures were inconsistent with each other, and inconsistent with the medical evidence. For example, in January 2009, claimant said he suffered one seizure every week or two. (AR 503).

---

[5] Claimant alleges that the ALJ "never specifically considered or gave weight to the opinions from the nonexamining state agency psychological consultants." (Doc. 13, at 12). Although the ALJ does not reference Dr. Westra by name, he clearly did address Dr. Westra's opinion.

Six months later in July he reported having no seizures in the last two weeks. (AR 502). But in April 2010, Ms. Weidler summarized claimant's seizure history and asserted he had between 7 and 35 seizures a week and 28 to 140 seizures a month. (AR 327). Claimant also stated in April 2010 that he had 70 seizures a week and 300 a month. (AR 329). In August, Ms. Weidler stated claimant had up to five seizures a day. (AR 851). In January 2011, claimant told a practitioner that he had fifteen seizures a week. (AR 652). By April 2012, claimant was reporting a minimum of three seizures and up to five seizures a day. (AR 867, 873). At his May 2014 hearing, claimant testified to suffering daily blackout seizures lasting up to an hour. (AR 41).

Objective medical testing did not corroborate the number or severity of seizures claimant alleged. Epilepsy or a seizure disorder is routinely documented by the use of electroencephalography (EEG). SSR 87-6, 1987 WL 109184 (1987), at *3. However, EEG studies failed to register the existence of any seizure. (AR 506, 867, 873). In April 2012, claimant was admitted at the University of Iowa Hospitals and Clinics (UIHC) for five days to evaluate his epilepsy. During that time, claimant stated he had a minimum of three seizures and up to five seizures a day. (AR 867, 873). While there, claimant underwent video electroencephalography (VEEG) monitoring, which did not capture any seizures while claimant was at the UIHC. (AR 866-70). Dr. Mark Granner, M.D., a UIHC professor opined that "an epileptic basis for [claimant's report of feeling light headed on two occasions while at UIHC] was not directly proven" because there was no indication on the VEEG. (AR 870). Nor did the VEEG record behaviors such as convulsions or lip smacking, which claimant and Ms. Weidler alleged claimant frequently experienced. (AR 870, 871, 874).

The lack of independent observation of claimant's alleged seizures is consistent with other records. Claimant was jailed on January 22, 2008, August 24, 2008, and January 27 and 29, 2010, where he was checked by staff at fifteen minute intervals. None

of the records show anyone observing claimant suffering a seizure. (AR 570-71, 546-48). In March 2010, claimant was admitted to a mental health facility for four days because he threatened self-harm, but the staff did not record observing any seizures. (AR 479-81). In 2010, claimant was alleging he suffered daily seizures. Although the ALJ did not rely on these events in reaching his conclusion, the Court may consider it in determining whether the ALJ's decision was consistent with other parts of the record. *See Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014) (holding that a reviewing court may consider the record as a whole in determining whether the ALJ's decision was consistent with the record).[6]

Similarly, neurological examinations reflect repeated normal findings. In August 2007, Dr. Lawrence Asbury stated claimant's neurological signs were within normal limits. (AR 529). In April 2008, July 2009, and February 2010, Dr. Seeley stated claimant had normal neurological findings. (AR 502, 507, 618). In August 2011, Allen Memorial Hospital records reflect normal neurological signs. (AR 826). In April 2012, Dr. Mary Werz, a UIHC neurologist, found claimant was oriented, had normal speech, could subtract by sevens, and claimant's cranial nerves, motor functioning, sensation, and coordination were all within normal limits. (AR 864-66).

The ALJ was not bound to credit opinions resting on a claimant's unsupported claims, particularly when they were contradicted by other evidence. Indeed, a physician's opinion is not entitled to any special weight where, as here, the opinion is based largely on the subjective statements by the claimant and is not supported by other

---

[6] The only reference I could find in the record of independent people observing claimant having a seizure was in a 2007 medical record which reflects unnamed bystanders brought claimant into the hospital after observing "a 1 to 2 minute episode of uncontrolled movement of his head. No [loss of consciousness] or other [seizure] like activity." (AR 528).

16

evidence. *See Kirby*, 500 F.3d at 709 ("It is the function of the ALJ to weigh conflicting evidence and to resolve disagreements among physicians . . . . The ALJ was entitled to give less weight to Dr. Harry's opinion, because it was based largely on Kirby's subjective complaints rather than on objective medical evidence."); *Harker v. Colvin*, No. 15-cv-2032-CJW, 2016 WL 3440608, at *7 (N.D. Iowa June 20, 2016) (holding that the ALJ properly discounted the weight afforded to a physician's opinion when it was based largely on the claimant's subjective statements). Where a claimant is incredible regarding his impairments, an ALJ may properly discount the weight given to providers' opinions which are based on the claimant's statements. *Julin v. Colvin*, 826 F.3d 1082, 1088 (8th Cir. 2016).

In summary, I find there is substantial evidence in the record as a whole for the weight the ALJ afforded the opinions of the various medical sources. *See Hensley v. Colvin*, 829 F.3d 926, 931-32 (8th Cir. 2016) (stating that an ALJ must determine the RFC based on "all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [his] limitations," but "there is no requirement that an RFC finding be supported by a specific medical opinion.") (alterations in original).

### B. *The Residual Functional Capacity Determination*

Claimant argues the ALJ erred in determining claimant's residual functional capacity because it was not supported by substantial medical evidence from a treating source. (Doc. 13, at 11-13). I find the ALJ properly accounted for claimant's impairments in structuring claimant's RFC limitations and the RFC assessment is supported by substantial evidence on the record as a whole.

The medical records do support a finding that claimant had problems with memory. (AR 864, 907-908). Dr. Scott was a consultative examining psychologist. Dr.

Westra noted that Dr. Scott's clinical findings "show[ed] problems with memory, but it remains at a functional level, especially for rote learning and visual learning." (AR 653-54, 659). Dr. Westra rated claimant's functioning in twenty work-related areas, finding no significant limitations in nine of those areas and only moderate limitations in the remaining eleven. (AR 656-57). Based on Dr. Westra's review of claimant's medical records, she concluded claimant could perform "simple, repetitive, and overlearned tasks in predictable settings with minimal social demands." (AR 659). Dr. Westra also opined that claimant could learn new tasks, but it might take him longer. *Id*. She also concluded claimant could manage superficial contact with others. *Id*.

In determining claimant's residual functional capacity, the ALJ accounted for claimant's memory problems by restricting claimant to simple, routine, repetitive tasks with little interaction with others and no independent judgment. (AR 16-17). The ALJ accounted for claimant's need for predictable settings with minimal social demands by restricting him to tasks that would not require him to interact, share, or gather information from the public. (AR 17). To account for claimant's need for only superficial contact with others, the ALJ indicated that claimant requires a job that is performed independently, and that he should not be required to coordinate his efforts with others, or organize his efforts with others to achieve a task. *Id*. The ALJ's residual functional capacity determination, therefore, was consistent with the reviewing doctor's findings. *See Buford v. Colvin*, 824 F.3d 793, 797 (8th Cir. 2016) (finding the ALJ's residual functional capacity assessment was supported by substantial evidence, noting that it was consistent with the limitations identified by the reviewing consultant). With all of these limitations in mind, the independent vocational expert testified that there were thousands of jobs in Iowa and in the nation that claimant could still perform. (AR 23-24).

Claimant argues the ALJ had a duty to more fully develop the record to obtain evidence from a treating physician regarding claimant's functional limitations. (Doc. 13,

at 11-12). He argues the ALJ's residual functional capacity assessment is inadequate because it did not rest on the opinion of any examining or treating physician. (Doc. 13, at 13). To the contrary, the ALJ considered the opinions and medical evidence of all of the treating and examining physicians. He specifically took into account the opinion of Dr. Scott, an examining consultative psychologist, that claimant's memory problems were still in the functional level. The evidence as a whole allowed the ALJ to understand claimant's functional limitations as a whole and how they would impact his ability to work. Accordingly, the ALJ did not need to develop the record further. *See Cox v. Astrue*, 495 F.3d 614, 620 n.6 (8th Cir. 2007) (noting that explicit work limitation opinions from a medical source are unnecessary where a claimant's functional limitations are reflected with "sufficient generalized clarity to allow for an understanding of how those limitations function in a work environment."). The ALJ's reliance on the state agency consultative psychologist's opinion also provided substantial evidence for the ALJ's residual functional limitation assessment. *See also Buford*, 824 F.3d at 797 (finding ALJ did not have to obtain "an opinion from a treating or consultative doctor as to Buford's work related limitations" because "medical assessments of state agency medical consultants as to Buford's limitations are of record and were expressly considered by the ALJ."). An ALJ's residual functional capacity findings simply do not need to "be supported by a specific medical opinion." *Hensley*, 829 F.3d at 932. Therefore, even if some evidence may support claimant's assertion that he had other functional limitations, "the ALJ adequately articulated his reasons for not fully crediting [claimant's] subjective complaints." *Buford*, 824 F.3d at 797.

## VI. CONCLUSION

For the reasons set forth herein, I respectfully recommend the District Court **affirm** the Commissioner's determination that claimant was not disabled, and enter judgment against claimant and in favor of the Commissioner.

Parties must file objections to this Report and Recommendation within fourteen (14) days of the service of a copy of this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1) and FED. R. CIV. P. 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* FED. R. CIV. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**IT IS SO ORDERED** this 23rd day of January, 2017.

_____
C.J. Williams
Chief United States Magistrate Judge
Northern District of Iowa